**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jon Secord,<br><br>    Plaintiff,<br><br>v.<br><br>Marketo Incorporated,<br><br>    Defendant. | No. CV-18-03142-PHX-GMS<br><br>**ORDER** |

Pending before the Court is Defendant Marketo Incorporated ("Defendant" or "Marketo")'s Motion for Summary Judgment, (Doc. 60), and Plaintiff Jon Secord ("Plaintiff" or "Mr. Secord")'s Cross Motion for Partial Summary Judgment, (Doc. 71). Defendant's Motion is granted in part and denied in part and Plaintiff's Motion is denied.

## BACKGROUND

Defendant employs sales professionals to identify retail customers and negotiate contracts for software licensing and services. On March 17, 2017, Defendant hired Plaintiff as a North American Enterprise Account Executive. On July 17, 2018, Defendant terminated its employment relationship with Plaintiff. On September 24, 2018, Plaintiff filed the underlying complaint seeking allegedly unpaid commissions in the amount of $503,246.00 pursuant to A.R.S. § 23-350. Plaintiff also alleged breach of contract, breach of covenant of good faith and fair dealing, and unjust enrichment based on the same unpaid commissions. Plaintiff's amended complaint, filed January 17, 2019, added a fifth claim for retaliation pursuant to A.R.S. § 23-1501. In connection with this claim, Plaintiff alleges

1 | that two hours prior to his termination on July 17, 2018, Plaintiff informed Defendant via email that Defendant had a legal obligation to pay Plaintiff all the compensation that he was owed, and that he had the reasonable belief that Defendant was violating the statutes of the State of Arizona by not paying this compensation. Plaintiff alleges that Defendant terminated Plaintiff's employment because of this email. Defendant subsequently filed this Motion for Summary Judgment, to which Plaintiff responded with a Cross Motion for Partial Summary Judgment.

**DISCUSSION**

**I.     Legal Standard**

The purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Parties opposing summary judgment are required to "cit[e] to particular parts of materials in the record" establishing a genuine dispute or "show[] that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). A district court has no independent duty "to scour the record in search of a genuine issue of triable fact[.]" *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

**II.    Analysis**

Defendant asserts that Plaintiff has "failed to raise a triable issue of material fact

with respect either to his (i) wrongful termination (Count V) or (ii) contract- and wage-related claims (Counts I-IV)." (Doc. 60 at 1.) Plaintiff responds that the Court should deny Defendant's motion and grant summary judgment in favor of Plaintiff on his claims for breach of contract, breach of the covenant of good faith and fair dealing, and violation of A.R.S. § 23-350 because there is "no dispute as to the terms of Mr. Secord's compensation agreement, the sales that he closed, and the commissions that he is owed." (Doc. 71 at 1–2.) Plaintiff further argues that because there are "material issues of fact concerning Mr. Secord's claim under the Arizona Employment Protection Act that he was fired in retaliation for reporting Marketo's unlawful conduct," Defendant's "motion for summary judgment on the wrongful termination claim should be denied and a trial should be set on the wrongful termination claim." *Id.*

### A. Wrongful Termination (Retaliation)

To succeed on a claim for retaliation under the Arizona Employment Protection Act (AEPA), A.R.S. § 23-1501, a plaintiff must demonstrate (1) that he had information or a reasonable belief that his employer or another employee violated an Arizona statute or constitutional provision; (2) that he disclosed the information or belief to an employer or a representative of the employer whom he reasonably believed was in a managerial or supervisory position and had the authority to investigate the information and take action to prevent further violations of the Arizona constitution or statutes; and (3) that he was terminated because of the first two steps. *Revit v. First Advantage Tax Consulting Servs.*, LLC, No. CV10-1653-PHX-DGC, 2012 WL 1230841, at *2 (D. Ariz. Apr. 12, 2012). Defendant argues that it is entitled to summary judgment on Plaintiff's claim because Plaintiff "did not disclose suspected unlawful activity to a decision-maker prior to his termination, and he therefore cannot establish a causal link between his so-called disclosure and his termination." (Doc. 60 at 3.)

Plaintiff admits he was paid his 2018 base salary in full, but alleges he was discharged because he reported his concern that he was not paid all "variable compensation" for 2018 sales. (Doc. 61 at 1.) Plaintiff asserts that in a July 17, 2018 email

to his supervisor Dan Jacobs shortly before his termination, he "reported his concern that he was not being paid the money that he had earned," and that it is "clearly . . . a violation of state law for a company to fail to pay wages to an employee. *See* A.R.S. §23-350 et. seq." (Doc. 71 at 15.) In his motion, Plaintiff identifies this email to Mr. Jacobs as the "the key exhibit in [his] wrongful termination claim."[1] (Doc. 71 at 18.) The content of the email is undisputed:

> I was just contacted by . . . Brent Avila asking why he wasn't comp'd on the Avnet deal. He said that he has a note from Pauline stating that we are not to get credit because this was a "house" account brought in/done by Matt Heinz. While Matt was crucial in negotiating this deal at the end—this is a named account of mine and we had (3) separate opportunities we were working all year that were rolled into a larger, global agreement at the end of Q2. We had two opportunities with Avnet, one with Premier Farnell (sub of Avnet) and one with Element14 (sub of Premier Farnell). I am confused by the comment "this is a house account and was brought in by Matt". Are you available to discuss this today Dan?

(Doc. 72-1 at 59.)

While it is true that a plaintiff need not "specify . . . which Arizona statute . . . [was being] . . . violated" to prevail on a retaliation claim under A.R.S. § 23-1501, the plaintiff still must actually disclose belief of a violation. *Morris v. Terros, Inc.*, 2006 U.S. Dist. LEXIS 53313, *26 (D. Ariz.). In *Morris*, the plaintiff "convey[ed] her belief" that state laws were being violated by "refus[ing] to comply with [her supervisor's] directive to falsify client records." *Id.* at *4. In *Murcott v. Best Western International, Inc.*, 198 Ariz. 349, 353, 9 P.3d 1088, 1092–1093 (Ct. App. 2000), *as amended* (Oct. 16, 2000), the plaintiff "raised objections . . . regarding the perceived departure from [company] policies at a board [of directors] meeting at which he also stated that this departure . . . could 'possibly lead to an antitrust lawsuit,'" and, on another occasion, expressed his objection to a member of the board of directors' actions by meeting with the director and "telling [him] that his actions were 'immoral' and 'illegal.'" *See also Medina v. Chas Roberts Air*

---

[1] In his deposition, Plaintiff testified that his "disclosure" that Defendant "was engaged in illegal conduct" was his email to Steve Lucas, the CEO of Marketo, on the evening of July 17th, 2018, the day he was terminated. (Doc. 65-29 at 332–339.) However, as this email was sent after Plaintiff was terminated, it cannot constitute the reason for which he was terminated and the Court will not address it here.

- 4 -

*Conditioning, Inc.*, No. CV 05-4214-PHX-SMM, 2006 WL 2091665, at *2 (D. Ariz. July 24, 2006) ("Plaintiffs . . . allege that Defendants breached . . . § 23–1501(3)(c)(ii)[] by discharging them in retaliation for filing [a] Class Action and responding to discovery requests that Defendants were violating Arizona payment laws.").

Here, Plaintiff did not disclose belief that a violation had occurred. As Plaintiff noted in deposition testimony, on July 17, 2018 he sent emails "ask[ing] for a meeting to explain why the Avnet transaction was decided to be a house account when it was a named account of mine," but "didn't call out illegal activity." (Doc. 65-29 at 339.) Emails requesting clarification do not constitute disclosure of suspected unlawful activity. Summary judgment is granted in favor of Defendant on the retaliation claim.[2]

### B. Contract and Wage Claims

In Counts I-IV of Plaintiff's Amended Complaint, Plaintiff alleges he is owed $503,246 in unpaid commission earned between January 1, 2018 and his termination on July 17, 2018, because he is entitled to commissions on renewals as well as new business,[3] and because he was underpaid commission on a deal closed with Avnet on June 30, 2018. Plaintiff accordingly seeks treble damages for unpaid wages pursuant to A.R.S. § 23-355 (Count I) and alleges breach of contract (Count II), breach of covenant of good faith and fair dealing (Count III), and unjust enrichment (Count IV). Defendant asserts that it paid Plaintiff all commission to which he was entitled under the express terms of his contract.

To prevail on a claim for breach of contract, a plaintiff must prove the existence of a contract, breach, and resulting damages. *Chartone, Inc. v. Bernini*, 207 Ariz. 162, 170,

---

[2] At oral argument on February 21, 2019, the Court asked the parties to address *Reel Precision, Inc. v. FedEx Ground Pkg. Sys.*, No. CV-15-02660-PHX-NVW, 2016 U.S. Dist. LEXIS 106404, at *17 (D. Ariz. Aug. 8, 2016), which notes that the AEPA provides no cause of action for an allegation that an employee's termination was in retaliation for raising to the employer its failure to pay wages due because it is limited by A.R.S. § 23-1501(B). Although the Court agrees that *Reel Precision* is analogous to the instant case, the Court declines to follow its reasoning. Under a plain reading of Section B, that section does not modify § 23-1501(3)(c)(ii), and the Court cannot find any authority from this court, the Arizona state courts, or the state legislature (other than *Reel Precision*), that indicates otherwise.

[3] Plaintiff processed renewals for three clients in 2018: Microchip Technologies (on January 13, 2018, for $328,101), Blue Cross Blue Shield of Arizona (on April 14, 2018, for $61,500), and Infusion Software, Inc. (on June 2, 2018, for $215,652).

83 P.3d 1103 (App. 2004). The burden is on the plaintiff to prove her damages "with reasonable certainty." *Gilmore v. Cohen*, 95 Ariz. 34, 36, 386 P.2d 81, 82 (1963). Plaintiff and Defendant agree that the terms by which Plaintiff earned commission are set forth in the company-wide 2018 Variable Incentive Compensation Plan ("VICP") and Plaintiff's 2018 Individual Compensation Quota Agreement ("ICQA"), and that together these documents represent the entirety of the commission contract between Plaintiff and Defendant. The parties also agree that pursuant to the ICQA, Plaintiff earned commission based on the Annual Recurring Revenue ("ARR") of his Subscription and Support sales.[4] Finally, the parties agree that, per the VICP, a sale may fall into five separate "booking types": new business (an entirely new customer), up-sell (more products or services to an existing customer), cross-sell (different products or services to existing customers), retention/renewal (extending an existing customer's contract terms without change), and services.

### 1. Renewal Commissions

Plaintiff and Defendant disagree about whether Plaintiff was eligible to earn commissions on retention/renewal sales. Both parties argue that the plain language of the VICP and ICQA supports their respective position.

When interpreting a contract under Arizona law, courts "first consider[] . . . evidence that is alleged to . . . illuminate the meaning of the contract language[] or demonstrate the parties' intent . . . and, if [they] find[] that the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 153–54, 854 P.2d 1134, 1139–40 (1993). Defendant offers the deposition testimony of Jami Rokurou, a Marketo employee responsible for calculating commission payments for New Business Account Executives in 2018 (including Plaintiff), (Doc. 74 at 7), for the provision that "'[r]enewal is treated differently' than new business, upsell, and cross-sell

---

[4] Plaintiff earned a 7% commission on sales up to his annual sales quota of $1,068,000; a 26.35% commission on sales after he met his quota and up to 150% of his annual quota (from $1,068,001 up to $1,602,000); and a 28% commission on sales from $1,602,001 and above.

bookings." (Doc. 72 at 7.) Ms. Rokurou further testified that "renewal would be in [an employee's] incentive compensation and quota agreement plan if they're paid on renewal," and that Defendant makes a "different set of calculations in the incentive compensation plan for someone who's paid on renewals." (Doc. 65-13 at 13.)

The language of the contract is "reasonably susceptible" to Defendant's interpretation. Section C of the VICP defines "Commissionable Events" as "All or a subset of Booking Types (as set forth in Section E)." (Doc. 65-1 at 3.) Section E, under the heading "Quota Crediting Rules," provides for "Quota Retirement" based only on "net new business or cross-sell" subscriptions, with no mention of retention/renewal sales. *Id*. at 5. Plaintiff therefore misapprehends this section when he asserts that "the definition of a commissionable event is found within Mr. Secord's VICP and states that 'all or a subset of the booking types' (new business, up-sell, cross-sell, retention/renewal, and services) are considered a commissionable event," (Doc. 75 at 2); the words "[a]ll or a subset of Booking Types" are clearly modified by the booking types "set forth in Section E"—only "net new business or cross-sell" subscriptions. (Doc 65-1 at 3, 5.) Plaintiff further misapprehends the language of the contract when he claims that his ICQA "states that *all* subscription and support deals (without reference to booking type) are credited towards quota attainment" (Doc. 71 at 6). Plaintiff's ICQA does not state this. Rather, the ICQA equates "Subscription and Support ARR" to "Quota Credit," (Doc. 65-2 at 3), which is defined in the VICP as the "amount of credit that will be granted to an Employee for events or actions deemed commissionable" (as defined under "Commissionable Events," discussed above).

Plaintiff cites no other language in the contract to support his position. And even if the contract language were "reasonably susceptible" to Plaintiff's proposed interpretation, which it is not, Plaintiff has introduced no extrinsic evidence—outside of his own unsupported deposition testimony that the term "Subscription and Support" includes "all the deals . . . whether it's retention, up-sell, or cross-sell," (Doc. 65-DD at 362)—to support his position. Plaintiff has not raised a triable issue of fact that he is entitled to commission on renewals. Summary judgment is therefore granted in favor of Defendant on all claims

related to unpaid renewal commissions.

### 2. Avnet Commission

Of the new business, up-sell, and cross-sell deals for which Plaintiff received commission in 2018, Plaintiff objects to his commission on a deal closed with Avnet on June 30, 2018. The parties agree that Avnet was an existing Marketo customer in 2018 when Plaintiff identified a potential sales opportunity that evolved into a "rip and replace deal," meaning that Avnet would be substituting a new deal with Defendant for an existing one. The parties also agree that the total cost value of the three-year deal was $7,012,371.49, and that Plaintiff was paid $533,047.85 in commission. However, Plaintiff argues that his commission should have been higher because it should not have been calculated with an ARR adjusted by a credit to Avnet for its existing deal. Plaintiff also claims that his compensation for the sale's Bizible component was incorrectly calculated.

#### a. ARR Calculation

Defendant asserts that, because Avnet was an existing customer, the "new bookings ARR" on the deal was adjusted to credit Avnet for its existing contract, totaling $1,728,477.31 instead of $2,337,457.16, as "reported to Marketo's CEO and sales leadership the same day the deal closed." (Doc. 60 at 12.) Defendant further claims that, at the time of the deal, Plaintiff understood that "any ARR associated with the new deal would be offset by Avnet's current spend if it closed." (Doc. 60 at 12.) Defendant cites two emails from Plaintiff's supervisor Matt Heinz to Plaintiff prior to the close of the deal in which Mr. Heinz mentions "some sort of refund" and a "credit . . . based on what [Avnet has] already paid" as evidence that Plaintiff knew about the credit to Avnet in advance. (Doc. 61 at 7.) Defendant also notes that the final signed Avnet contract "states on its face it 'supersedes and replaces [two prior orders] and each Party is discharged from its obligations thereunder,' confirming the June 30, 2018 Avnet deal superseded and replaced ('ripped and replaced') the existing Avnet contract." (Doc. 60 at 12.)

The language of the contract is "reasonably susceptible" to Defendant's interpretation. ARR, "the one-year recurring subscription value" of a deal, is typically

calculated by dividing the total contract value of a sale by the number of years covered by the sale to arrive at an annual revenue on which commissions are based. (Doc. 60 at 2.) However, a "booking," the total value of an order as determined by Defendant's corporate controller or chief financial officer, may vary from the ARR depending on specific terms in the agreement, such as "superseding previous agreements[] or discounts on products or services." (Doc. 65-1 at 2.) When an employee is credited with a booking, "such [e]mployee's [q]uota will be retired by the amount of ARR attributed to such [b]ooking." (Doc. 65-1 at 5.) Thus, if the ARR attributed to the June 30, 2018 booking was offset by Defendant's prior contract with Avnet because the June 30 deal "superseded" the prior agreement, the adjusted ARR, rather than the unadjusted ARR, would be the correct ARR from which to calculate Plaintiff's commission.

Plaintiff nevertheless argues that the unadjusted ARR, not the adjusted ARR, should be used to compute his commission. Plaintiff argues that because rip and replace deals "by [their] plain meaning, constitute[] a new business deal," Plaintiff should earn a commission on the entire ARR of the Avnet deal. (Doc. 71 at 8.) Plaintiff does not cite any portion of his contract or any outside evidence to support his position that commission on rip and replace deals should be calculated using an unadjusted ARR just because they constitute "new" business deals.[5] Plaintiff has not raised a genuine dispute of material fact on this issue, and summary judgment is granted in Defendant's favor on claims related to the adjusted ARR component of the Avnet deal.

### b. Bizible Component

Plaintiff also argues that Defendant miscalculated his commission on the Bizible product, a specific component of the Avnet deal. In 2018, Defendant was offering double compensation to sales professionals on sales of Bizible before August 31. Plaintiff asserts that the Bizible portion of the Avnet deal generated an ARR of $575,000.00, entitling him

---

[5] Defendant does not argue that rip and replace deals *do not* constitute new business deals, (Doc. 60 at 12) ("a 'rip and replace' deal[] mean[s] the customer substitutes a *new*, typically much larger, deal for an existing one, with a corresponding credit for its existing spend") (emphasis added); rather, it contends that Avnet was not "an *entirely net-new* sale," *id.* (emphasis added).

to commission on an additional $575,000.00. Defendant does not dispute that the double compensation incentive was in effect but argues that the Bizible ARR was reduced to $191,666.66 in the days before the sale closed.

Plaintiff and Defendant offer competing timelines of the days leading up to the close of the Avnet deal. The parties agree that as of June 26, four days before the close of the deal, Plaintiff's supervisor Matt Heinz exchanged emails with Bizible CEO Aaron Bird related to the pricing of the Bizible portion of the Avnet deal. In that exchange, Mr. Heinz stated that the ARR of the Bizible component was $414,000.00 at that time, though he noted that Defendant "do[es] not provide line item pricing for deals like this," giving Mr. Heinz "the flexibility to move dollars around to fit the narrative we want when we are selling the deal." (Doc. 65-15 at 1.) On June 27, three days before the close of the deal, Marketo employee Justine Bousfield prepared an order form that was never signed representing the ARR of the Bizible component as $575,000.00. The next order form, created by employee Courtney Hays, no longer had a specific line-item for Bizible, such that it is not possible to determine the Bizible ARR from the face of the form. The signed form, executed on June 30, had a total contract value of $7,012,371.49, whereas the June 27 form had a total contract value of $6,944,952.00.

Plaintiff argues that the ARR of the Bizible component on the finally executed deal is $575,000.00, the value of the Bizible ARR when that component was broken out as a line-item in the June 27 order form. Defendant contends that as the deal evolved in its final three days, Avnet "substantially increased the number of automation and workflow contacts it wanted and added Elite Global Support service," such that to keep the total deal price roughly the same, "Mr. Heinz exercised his discretion to discount Bizible." (Doc. 73 at 14.) Defendant points to an email between Dan Jacobs and Tiffany Luck of Morgan Stanley (among others), in which the Bizible ARR for the Avnet deal is listed as $191,667, and the deposition testimony of Mr. Heinz that he had to "change discounting across other products, including Bizible, in order to fit all of these products in . . . within appropriate thresholds," (Doc. 74 at 16), as evidence to support its position.

The parties have sufficiently raised triable issues of fact on this issue "such that a reasonable jury could return a verdict" for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is therefore denied as to both parties on claims related to the Bizible component of the Avnet deal.

## CONCLUSION

Plaintiff has failed to raise a genuine issue of material fact on his claim for wrongful termination under the AEPA and on his claims for unpaid wages, breach of contract, breach of covenant of good faith and fair dealing, and unjust enrichment insofar as they relate to renewal commissions and the ARR of the Avnet deal. However, as triable issues of fact remain on the Bizible component of the Avnet deal, summary judgment is denied on those claims.

**IT IS THEREFORE ORDERED** that Defendant Marketo Incorporated's Motion for Summary Judgment (Doc. 60) is **GRANTED IN PART** and **DENIED IN PART** as stated above

**IT IS FURTHER ORDERED** that Plaintiff Jon Secord's Cross Motion for Partial Summary Judgment (Doc. 71) is **DENIED**.

Dated this 3rd day of March, 2020.

*G. Murray Snow*
G. Murray Snow
Chief United States District Judge